UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
DEVERRON ROBINSON and GREGORY ISSAC,

                    Plaintiffs,

                                                    **MEMORANDUM AND ORDER**
        -against-                                   20-CV-3388 (RRM) (RML)

NEW YORK CITY DEPARTMENT OF EDUCATION,

                    Defendant.
-------------------------------------------------------------------x
ROSLYNN R. MAUSKOPF, United States District Judge.

Plaintiffs Deverron Robinson and Gregory Issac, the parents of S.I., an autistic school-age child, bring this *pro se* action against defendant New York City Department of Education ("the DOE"), alleging that defendant violated the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, by failing to implement orders issued by Impartial Hearing Officers; retaliated against them in violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504"), by accusing them of child maltreatment; and violated 42 U.S.C. §§ 1983 and 12203. In a memorandum and order dated October 11, 2023, and filed October 12, 2023 (the "Second M&O"), the Court granted defendant's motion for summary judgment with respect to the Section 504 retaliation claim and the claims pursuant to 42 U.S.C. §§ 1983 and 12203, but denied summary judgment with respect to the IDEA implementation claim. Plaintiffs and defendant now cross-move for reconsideration of the Second M&O. For the reasons set forth below, both motions are denied.

## BACKGROUND

The facts of this case are set forth in some detail in the Second M&O. Although familiarity with the Second M&O is assumed, the Court will recap some of the undisputed facts for the convenience of the reader.

1

Plaintiffs live in New York City with S.I., who was diagnosed at age 3 with level three non-verbal autism, speech and language disorders, and social deficits.  (*Id.* at ¶¶ 4–5.)  The DOE's Committee on Preschool Special Education ("CPSE") created an Individualized Education Program ("IEP") for S.I. for the 2017–18 school year, and he was enrolled in a non-public school ("NPS") for both the 2017–18 and 2018–19 school years.  S.I. also received 32 hours of home health aide services which were provided at night, not during school hours, by plaintiffs' insurance company.

On February 15, 2019, plaintiffs and S.I. attended a Turning 5 meeting with the DOE's Committee on Special Education ("CSE") to begin the process of developing an IEP for when S.I. entered kindergarten in the 2019–20 school year.  According to plaintiffs, prior to the meeting, they saw a completed IEP bearing S.I.'s name on the desk of Dinorah Sanchez, a school psychologist and one of the participants at the meeting.  They also saw an application to an NPS, the Tiegerman School, that Ms. Sanchez was completing for another student.  When plaintiffs inquired why S.I. could not attend Tiegerman, Ms. Sanchez allegedly stated that he could not go to an NPS because plaintiffs were black and lacked "equity."  At the subsequent CSE meeting, Ms. Sanchez told plaintiffs that the DOE was recommending a District 75 program and would not consider an NPS unless plaintiffs obtained an acceptance letter from such a school.[1]

Following the meeting, plaintiffs attempted to find an NPS that would accept S.I. Following a visit to an NPS in mid-March 2019, they emailed Natasha Dobra, a DOE employee, to inform her that S.I. was on a waitlist and to ask her to advocate for S.I. with the NPS. Plaintiffs claim that they told Ms. Dobra that S.I. was not in school.

---

[1] The DOE's District 75 programs provide highly specialized instructional support for students with significant challenges, such as Autism Spectrum Disorders.  *See* https://www.schools.nyc.gov/learning/special-education/school-settings/district-75/district-75-programs.

On April 18, 2019, plaintiffs received an IEP in the mail that offered S.I. placements at two different public schools for the 2019–20 school year.  Plaintiffs did not find the proposed placements acceptable and requested an impartial due process hearing.  Plaintiffs state that they requested an impartial hearing on September 20, 2019.

The impartial hearing began on Friday, April 3, 2020, before Impartial Hearing Officer ("IHO") James McKeever.  According to a transcript of that proceeding, Mr. Issac told the IHO that S.I. had "been out of school since September" and that plaintiffs were "teaching him at home."  (4/3/2020 hrg. at 4.)  When the IHO inquired why S.I. was not in school, plaintiffs initially suggested that S.I. had not been offered a placement.  (*Id.* at 9.)  However, Joseph Montano, who represented the DOE at the hearing, subsequently clarified that the IEP contained specific recommendations.  (*Id.* at 22.)  Stating that "[s]omething has to happen with this child," (*id.* at 22), the IHO then directed Mr. Montano to ascertain how the DOE was "providing remote learning for the kids that were in the class that they initially recommended" for S.I., and expressed his intention to "set that up" for S.I. as well, (*id.* at 31).

IHO McKeever then adjourned the hearing until Tuesday, April 7, 2020.  (*Id.*)  However, around 9:00 a.m. on Monday, April 6, a DOE employee named Amrita Vasishtha telephoned the Mandated Reporter Hotline of the State Central Register of Child Abuse and Maltreatment ("SCR").  Minutes later, Ms. Vasishtha made a contemporaneous record of the call in the Events Log of the Special Education Student Information System ("SESIS"), the DOE system that contains educational records of special education students.  According to that record, Ms. Vasishtha told the SCR that a parent had stated on the record at an impartial hearing that S.I. was not attending school because the parent disagreed with the IEP provided.  She also stated that plaintiffs were "not cooperative with [S.I.'s] educational plan" and that S.I. was "falling behind

in educational skills." Ms. Vasishtha's account of the call was largely corroborated by the SCR's Intake Narrative, which recorded her as stating that S.I.'s mother had "not been cooperative with the child's educational placement," that S.I. had "missed excessive days from school," was "not meeting his educational goals," and was "failing and … falling behind academically" as a result.

Sometime prior to the hearing on April 7, plaintiffs were contacted by a Child Protective Specialist, Ms. Farmer. (Plaintiffs' 56.1 at ¶ 35.)[2] About two months later, on June 5, 2020, CPS closed the case against plaintiffs as unfounded. There is no indication that CPS ever initiated legal action to remove the children from plaintiffs' home.

The impartial hearing continued throughout the time that plaintiffs were being investigated by CPS. After the April 7, 2020, hearing, IHO McKeever recused himself and was replaced by IHO Mindy Wolman. On May 7, 2020, the IHO issued an interim, pendency order which required that the DOE continue to provide Special Education Teacher Support Services ("SETSS"), Speech-Language Therapy ("SLT"), Physical Therapy ("PT") and Occupational Therapy ("OT").

FOFD-2020

On July 16, 2020, IHO Wolman issued her Findings of Fact and Decision ("FOFD-2020"), in which she concluded that the District 75 program recommended by the CSE in S.I.'s February 2019 IEP was "insufficient and inappropriate" and that S.I. required placement in an NPS program. (FOFD-2020 at 6.) She found that the DOE had denied plaintiffs due process by determining S.I.'s placement prior to the CSE meeting and had improperly placed the burden on

---

[2] The agency that provides Child Protective Services in New York City is the Administration for Children's Services ("ACS"). Plaintiffs use both CPS and ACS to describe this agency.

plaintiffs to obtain an acceptance from an NPS program.  (*Id.* at 5.)  She also found that the DOE

had failed to conduct certain evaluations prior to making its placement recommendations, and

that those evaluations would likely be necessary to place S.I. in an NPS.  (*Id.* at 6.)

FOFD-2020 contained specific orders designed to rectify the due process violations.

Among other things, IHO Wolman directed the CSE to perform or arrangement for

neuropsychological, speech-language, occupational therapy, and physical therapy evaluations to

be completed prior to August 15, 2020.  (*Id.* at 7.)  The IHO also ordered the DOE's Central

Based Support Team ("CBST") to "file applications for admission to appropriate NPS programs"

and to "make arrangements for placement in an appropriate NPS program prior to the start of

school in September of 2020" (*Id.*)[3]  In addition, FOFD-2020 directed the CSE convene a

second meeting to consider the new evaluations and to add appropriate services and goals to

S.I.'s IEP, and directed the DOE to continue providing S.I. with SETSS, SLT, PT, and OT until

such time as S.I. was placed in an appropriate NPS program.  (*Id.*)

The Complaint and Amended Complaint

One week after IHO Wolman issued FOFD-2020, plaintiffs commenced this action

against the DOE by filing a *pro se* complaint.  The pleading invoked the Court's federal question

jurisdiction, alleging violations of the IDEA, "the FAPE Law," and Section 504.  (Complaint

(Doc. No. 1) at 4, 6.)  The pleading also alleged that the DOE violated plaintiffs' due process

rights by pre-determining S.I.'s placement and not allowing them to participate in the decision-

making and violated S.I.'s civil rights in some unspecified way.  Finally, the original complaint

alleged that the DOE "showed racial discrimination towards [S.I.] and … [his] family as a

whole," (*id.* at 6), but it did not explain how this discrimination was manifested.

---

[3] The CBST is the DOE office that matches students with state-approved non-public schools.  *See*
https://www.schools.nyc.gov/learning/special-education/school-settings/other-educational-settings.

The only relief demanded in the original complaint was money damages.  The pleading specifically stated: "We are suing the DOE for a billion dollars for everything that [S.I. and his family] … had to endure due to the Department of Education vindictively and maliciously calling ACS on our family …."  (*Id.* at 6.)  Although the caption of the complaint named both plaintiffs and S.I. as plaintiffs, it was signed only by Ms. Robinson.

Less than a month after the original complaint was filed and before the DOE answered or otherwise responded to the complaint, plaintiffs filed the Amended Complaint.  That pleading was almost identical to the original complaint except in three respects.  First, the Amended Complaint did not name S.I. as a plaintiff and named plaintiffs both in their individual capacities and as representatives of S.I. (Amended Complaint (Doc. No. 6) at 1.)  Second, it was signed by both plaintiffs, not just Ms. Robinson.  (*Id.* at 6.)  Third, the Amended Complaint alleged "Defamation," though it did not allege any facts in support of this claim.  (*Id.* at 4.)

<u>The Second Due Process Complaint and FOFD-2021</u>

Sometime prior to mid-November 2020, Gersh Academy ("Gersh"), an NPS, accepted S.I.  On November 10, 2020, plaintiffs sent the DOE and the chairperson of the CSE a 10-day notice of their intention to unilaterally place S.I. at Gersh.  Plaintiffs never received a response to the notice, and in December 2020, S.I. began attending Gersh.  Plaintiffs then filed a second due process complaint, seeking, among other things, to have DOE pay the school's tuition.

The matter was assigned to IHO Audrey Daniel, who conducted an impartial hearing.  On June 22, 2021, IHO Daniel issued her Corrected Findings of Fact and Decision ("FOFD-2021"), which held, among other things, that the DOE failed to provide S.I. with a free appropriate public education ("FAPE") during the 2020-21 school year and that Gersh was an appropriate placement.  FOFD-2021 contained several specific orders, two of which are at issue here.  First,

6

it ordered the DOE to fund independent neuropsychological, speech-language, occupational therapy, physical therapy, and assistive technology evaluations, which were to be conducted by a licensed and/or certified provider chosen by S.I.'s parents.  Second, the FOFD directed the DOE to reimburse S.I.'s parents for home health aide services used during school hours for the 2019–20 and 2020–21 school years when S.I. was not attending a private or public school.  (*Id.*)  That reimbursement was to be provided "within thirty days of invoice and/or proof of payment and attendance records."  (*Id.*)

<u>The Motion to Dismiss and Motion to Amend Complaint</u>

A few months before IHO Daniel issued FOFD-2021, defendant moved to dismiss the Amended Complaint in this case.  That motion raised six points, the first three of which each encompassed two separate arguments.  The first point sought to dismiss plaintiffs' IDEA claims, arguing 1) that compensatory damages are unavailable for violations of that statute and 2) that plaintiffs failed to exhaust their administrative remedies before bringing their IDEA claim.  The second point addressed plaintiffs' claims under Section 504, principally contending that those claims were predicated solely on an IDEA violation and did not allege discrimination based on S.I.'s disability.  Construing the Amended Complaint as alleging a Section 504 retaliation claim, defendant also argued that plaintiffs had not made out such a claim.  In its third point, the DOE argued that plaintiffs failed to state either procedural or substantive due process claims under the Fourteenth Amendment because they not only availed themselves of the procedural remedies provided by the IDEA, but obtained the relief they sought by virtue of those proceedings.

In the fourth point, defendant noted that the racial discrimination and defamation claims were conclusory.  In its fifth point, defendant contended that plaintiffs, as *pro se* litigants, could not bring claims on behalf of their child.  And in the sixth and final point, defendant urged the

Court to decline to exercise supplemental jurisdiction over plaintiffs' state-law claims if it concluded that the Amended Complaint failed to state a federal cause of action.

On July 8, 2021, while the motion to dismiss was pending, plaintiffs moved to amend the complaint for a second time.  Although plaintiffs' motion was filed less than three weeks after IHO Daniel issued her FOFD, plaintiffs accused defendant of willful non-compliance with both FOFD-2020 and FOFD-2021.  (Motion to Amend (Doc. No. 30) at 1.)  Plaintiffs' motion did not identify the specific orders in the FOFDs that defendant had violated or failed to implement, though the proposed amended pleading alluded to failure to conduct evaluations and to provide S.I. with a FAPE.  (Proposed Amended Complaint (Doc. No. 30-1) at 5.)

In a memorandum and order dated September 29, 2021 (the "First M&O"), the Court granted defendant's motion in part and denied it in part.  First, with respect to the IDEA claims, the Court held that plaintiffs could not recover money damages for a violation of the IDEA but could sue for implementation of an IHO's order.  (First M&O (Doc. No. 38) at 14.)  Since it was unclear whether plaintiffs were seeking damages or reimbursement of tuition they had paid to Gersh, the Court did not dismiss the IDEA claim but directed plaintiffs to amend their pleading to clarify this point.  (*Id.* at 15–16.)

Second, the Court dismissed plaintiffs' Section 504 claims with prejudice for failure to state a claim.  The Court noted that although a Section 504 claim may be predicated on the claim that a disabled student was denied access to a FAPE, "'something more than a mere violation of the IDEA is necessary in order to show a violation of Section 504 in the context of educating children with disabilities ….'"  (*Id.* at 17 (quoting *Wenger v. Canastota Cent. Sch. Dist.*, 979 F.Supp. 147, 152 (N.D.N.Y. 1997)).  The Court noted that the facts alleged by plaintiffs

suggested that the Section 504 claim was based solely on violations of the IDEA.  (Prior M&O at 17.)

The Court also found that the Amended Complaint failed to state a claim for Section 504 retaliation.  (*Id.* at 18.)  However, the Court noted that plaintiffs' opposition papers suggested that plaintiffs might be able to allege a *prima facie* case.  (*Id.* at 19.)  Accordingly, although defendant's motion papers suggested a legitimate non-retaliatory reason for the alleged retaliatory act, the Court dismissed the Section 504 retaliation claim without prejudice.  (*Id.*)

Turning to the third point of defendant's motion to dismiss, the Court dismissed with prejudice those § 1983 claims which alleged procedural due process violations.  The Court noted that plaintiffs had not been denied the procedural or administrative remedies that the IDEA provides, since they were awarded a due process hearing before IHO Wolman, who ruled in their favor.  (*Id.* at 20–21.)  For this same reason, the Court also dismissed plaintiffs' § 1983 claims to the extent that plaintiffs were alleging that defendant violated their "substantive due process rights by offering inadequate services and developing an insufficient IEP to the degree of denying S.I. a FAPE."  (*Id.* at 21.)  The Court noted that facts alleged by the *pro se* plaintiffs suggested that they might be able to allege a substantive due process claim based on defendant's actions in reporting plaintiffs to the SCR, but noted that it was unlikely that plaintiffs would be able to state a substantive due process claim unless S.I. or other children were removed from plaintiffs' custody for more than a brief period.  The Court nonetheless implied that plaintiffs could include this claim in their subsequent pleadings.

With respect to the fourth and fifth points raised in defendant's motion to dismiss, the Court found that the Amended Complaint failed to state a claim for racial discrimination or defamation.  In addition, the Court noted that the defamation claim and any discrimination or

retaliation claims raised under state or municipal laws had to be dismissed for failure to allege compliance with New York Education Law § 3813 – a statute that requires a plaintiff to file notice of claim prior to the commencement of an action against the DOE or its officers.  (Prior M&O at 23.)  The Court declined to address the supplemental jurisdiction argument raised in defendant's sixth point, noting that the Court had "not yet dismissed with prejudice all the federal claims in this action."  (*Id.* at 24.)

Finally, the Court granted plaintiffs' motion to amend their pleading for a second time. The Court expressly granted plaintiffs permission to bring an IDEA claim seeking reimbursement for tuition payments to Gersh or equitable relief.  (*Id.* at 25.)  The Court further noted that plaintiffs could replead any of the claims raised in the Amended Complaint other than those which had been dismissed with prejudice.  (*Id.*)

The Second and Third Amended Complaints

In the months following the issuance of the First M&O, the *pro se* plaintiffs filed three new pleadings.  The first of these, which plaintiffs labeled the Second Amended Complaint ("SAC"), was filed on December 6, 2021.  (Doc. No. 40.)  A week later, plaintiffs filed a slightly revised version of the same document, which corrected typos in the original version.  (Doc. No. 42.)  In a letter accompanying that submission, plaintiffs identified the typos and represented that defendant had consented to the revisions.  (Letter (Doc. No. 42) at 1–2).)

On February 14, 2022 – four days after a status conference with Magistrate Judge Robert M. Levy and three days after defendant's counsel submitted a request that both the SAC and the corrected SAC be sealed because they contained S.I.'s name and birthdate – plaintiffs filed yet another pleading, entitled "Stipulation to Second Amended Complaint."  (Doc. No 46.)  That submission did not include a stipulation, though it was accompanied by a letter stating that

10

defendant had not opposed the filing of the pleading and that Judge Levy had granted plaintiffs permission to file an amended pleading.  Since this pleading was not entirely identical to the corrected SAC, the Court refers to it as the Third Amended Complaint ("TAC").

The TAC contains two claims.  The First Claim for Relief alleges that defendant violated the IDEA by failing to comply with the two FOFDs.  Although this cause of action alleges that plaintiffs were harmed by S.I. being denied a FAPE in the 2019–20 and 2020–21 school years, it seeks only injunctive and equitable relief and not money damages.

In contrast, the Second Claim for Relief seeks $1.5 billion in money damages for violations of Section 504, 42 U.S.C. § 1983, and 42 U.S.C. § 12203.  Although this cause of action does not specifically mention retaliation, it appears to principally allege a Section 504 retaliation claim, asserting that "Defendant[ ] contacted SCR immediately while involved in a protected activity with the Plaintiffs."  (TAC at ¶ 109.)  The claim does not allege any facts suggesting a violation of 42 U.S.C. §§ 1983 and 12203.

<u>The Motion for Summary Judgment and the Second M&O</u>

In February 2023, defendant moved for summary judgment with respect to all the claims alleged in the TAC.  That motion raised four points, the first two of which related to the Section 504 retaliation claim.  First, defendant argued that plaintiffs could not prove a plausible connection between their protected activity and Ms. Vasishtha's call to the SCR.  Second, defendant asserted that it had articulated a legitimate, non-retaliatory reason for reporting plaintiffs to the SCR and that plaintiffs had not offered proof that this reason was a pretext for the alleged retaliation.

The third point addressed two of the claims encompassed within the TAC's second cause of action.  First, defendant argued that plaintiffs' claim pursuant to 42 U.S.C. § 1983 failed to

allege a constitutional violation or the existence of a municipal policy or custom, as required by *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).  Second, defendant argued that plaintiffs' claim under 42 U.S.C. § 12203 sought only money damages, which are unavailable to private plaintiffs under the statute.  *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F. 3d 79, 86 (2d Cir. 2004).

The fourth and final point contested that portion of plaintiffs' second cause of action that alleges defendant has yet to comply fully with the FOFDs, claiming that the DOE implemented these orders to the "greatest extent possible."  In support of this point, defendant submitted declarations of Michael Pantalony, an Attorney Team Leader in the Special Education Unit of the DOE's Office of General Counsel, and Theresa Crotty, the Legal Advisor of the DOE's IHO Implementation Unit (the "IHOIU").  These declarations conceded that the DOE had not complied with all of the IHO's orders, but attempted to cast the blame for this non-compliance on plaintiffs.

The Pantalony Declaration attested to the DOE's efforts to comply with the orders contained in FOFD-2020.  Pantalony conceded that the neuropsychological, speech-language, occupational therapy, and physical therapy evaluations ordered by IHO Wolman had not taken place, but claimed that this failure was due to plaintiffs' failure to consent to evaluations.  Citing to the DOE's Procedural Safeguards Notice ("PSN") – a document that outlines the rights of parents and students pertaining to special education services and the procedures available to them to protect their rights – Pantalony claimed that the DOE could not evaluate S.I. without parental consent.  Pantalony further claimed that plaintiffs had refused to sign the necessary consent forms.

12

The Crotty Declaration attested to the DOE's efforts to comply with the orders contained in FOFD-2021. That declaration discussed in detail communications between Ms. Robinson and a DOE employee relating to reimbursement for home health aide services. In July 2021, Ms. Robinson sent the DOE an Excel spreadsheet that purportedly documented charges for the home health aide. The spreadsheet did not name the home health aide or the agency providing the services. On August 26, 2021, Angele Brown, an Implementation Associate at the IHOIU, emailed Ms. Robinson a detailed explanation of the documentation needed to obtain reimbursement for the home health aide. In essence, the IHOIU required proof of payment to a specific payee and an invoice from that agency or individual providing details of the services rendered. The email also asked Ms. Robinson to identify the providers plaintiffs had chosen to conduct the neuropsychological, speech-language, occupational therapy, physical therapy, and assistive technology evaluations ordered by IHO Daniel. (*Id.*, Ex. A, at 6.)

Less than two hours later, Ms. Robinson responded with an email stating that plaintiffs had made payments "directly to the aide out of pocket" and implying that plaintiffs lacked the proof of payment that the IHOIU requested. (*Id.*, Ex. A, at 5.) The next morning, Ms. Brown responded with an email which stated, in relevant part:

> If you are unable to provide the requested proofs of payments for reimbursement processing, please submit a signed, dated, notarized letter/affidavit stating the reason that you are unable to submit the proofs of payment for the student's home health aide services. Please list your name, the student's name, the case number, the specific service for which you seek reimbursement, the services date range, total cost, and total amount paid by you toward the service for which you seek reimbursement.

(*Id.*, Ex. A, at 5.)

A few hours later, Ms. Brown sent another email which appeared to contradict the clear directions in the above-quoted section of the previous email. Ms. Brown quoted the language

13

from FOFD-2021 which directed the DOE to reimburse plaintiffs for home health aide services "within thirty days of invoice and/or proof of payment and attendance records." (*Id.*, Ex. A, at 4.)  Ms. Brown then stated, "Please note that the IHO intended for this service … to be reimbursed to the parent for out-of-pocket payments for the service by use of invoice, proof of payment, and attendance." (*Id.*, Ex. A, at 4.)  The email did not explain what additional information, if any, was required.

That afternoon, Ms. Robinson responded in an email which implicitly rejected Ms. Brown's interpretation of the IHO's intentions.  (*Id.*, Ex. A, at 2–3.)  Ms. Robinson accused Ms. Brown of making "a bold statement to change an IHO order," and characterized it as "very confusing and disturbing." (*Id.*, Ex. A, at 3.)  Ms. Robinson stated that she intended to "submit an affidavit … stating that the Invoice that was submitted for Home Health Aide Services is accurate and was paid to the aide by cash by us." (*Id.*, Ex. A, at 2.)

Less than half an hour later, Ms. Brown sent Ms. Robinson an email which began: "We can authorize the reimbursement as long as the notarized letter is signed and dated, lists student's name, service name, date range of service, cost of service, amount paid by parent for the service for the date range provided." (*Id.*, Ex. A, at 2.)  The email did not mention the invoice or any need to provide the name of the home health aide or agency.  Rather, it concluded, "I look forward to receiving the detailed notarized letter to process payment reimbursement of student's home health aide services." (*Id.*, Ex. A, at 2.)

Ms. Robinson emailed Ms. Brown the notarized letter on the afternoon of August 30, 2021.  (*Id.*, Ex. A, at 1–2.)  In an email sent the following business day, Ms. Brown did not imply that the notarized letter was deficient.  (*Id.*, Ex. A, at 1.)  However, she implied that the Excel spreadsheet could not serve as an invoice and demanded additional information from the

14

provider of the home health aide services.  She stated that this information could submitted either in the form of "invoices/statements for the services rendered to the student from 7/7/2020 through 12/13/2020, listing the agency/provider's full name, the student's full name, the hours worked, the dates worked, hourly cost, total amount billed, and total CASH amount received from student's parents" or in the form of a notarized affidavit, signed by the provider, which contained this same information.  (*Id.*, Ex. A, at 1.)  According to Ms. Crotty, plaintiffs never responded to Ms. Brown's August 31, 2021, email and have not provided the documentation necessary to obtain reimbursement.  The Crotty Declaration also states that plaintiffs never identified the evaluators as requested in Ms. Brown's August 26, 2021, email The declaration does not indicate what, if anything, the DOE did to follow up on the August 2021 emails and to obtain the information requested therein.

<u>The Second M&O</u>

On October 11, 2023, the Court issued the Second M&O, which denied defendant's motion as to the IDEA implementation claim, but granted defendant summary judgment on the other three claims.  With respect to the IDEA implementation claim, the Court rejected defendant's claim that it had complied with the FOFDs "to the greatest extent possible."  First, the Court held that defendant was not bound by plaintiffs' refusal to consent to the evaluations ordered by IHO Wolman.  The Court noted that the PSN itself stated that that the DOE could "utilize mediation or due process complaint, resolution meeting, and impartial due process hearing procedures" if parents refused to consent to evaluations.  Indeed, the PSN summarized and cited to regulations set forth in 34 C.F.R. § 300.300 and 8 N.Y.C.R.R. § 200.5, which set forth in detail the procedure a school district can follow if a parent refuses to have a child evaluated or re-evaluated.  The Court concluded that "[w]hile the PSN states that the DOE is ordinarily not required to take action to override the parent's refusal to consent, the DOE's

15

inaction is clearly inconsistent with the assertion that they attempted to implement IHO

Wolman's order to the 'greatest extent possible.'"  (2d M&O at 31.)

Second, the Court held that the DOE made only minimal efforts to implement IHO

Daniel's order regarding evaluations.  Ms. Brown, an Implementation Associate at the IHOIU,

sent Ms. Robinson an email on August 26, 2021, which, among other things, asked Ms.

Robinson to identify the providers plaintiffs had chosen to conduct the neuropsychological,

speech-language, occupational therapy, physical therapy, and assistive technology evaluations.

However, there was nothing in the record to suggest that Ms. Brown or anyone else from DOE

made any effort to follow up on these requests.

The Court conceded that the DOE made much more substantial efforts to obtain the

documentation needed to reimburse plaintiffs for the home health aide services, as ordered in

FOFD-2021.  But that effort ended abruptly when Ms. Robinson failed to respond to Ms.

Brown's email of August 31, 2021.  Given the lack of evidence that Ms. Brown or anyone else in

the IHOIU made any effort to follow up or secure the information necessary to implement IHO

Daniel's order, the Court could not conclude as a matter of law that the IHOIU attempted to

implement FOFD-2021 to the 'greatest extent possible.'"  (*Id.* at 32.)  Accordingly, the Court

denied defendant's motion for summary judgment on the IDEA implementation claim.

The Section 504 Retaliation Claim

The Court analyzed the Section 504 retaliation claim under the burden-shifting

framework established for Title VII cases.  The Court determined that plaintiffs had made out a

*prima facie* case of retaliation, but that defendant had articulated a legitimate, non-retaliatory

reason for the decision to call the SCR.  The Court noted, among other things, that "school

officials" are "Mandated Reporters" under New York law and, as such, are "required to report or

cause a report to be made … when they have reasonable cause to suspect that a child is an abused or maltreated child where the parent, guardian, custodian or other person legally responsible for such child comes before them in their professional or official capacity and states from personal knowledge facts, conditions or circumstances which, if correct, would render the child an abused or maltreated child." (*Id.* at 24 (quoting N.Y. Soc. Serv. Law § 413(1)(a)). In New York, child maltreatment includes "the failure of [a] parent … to exercise a minimum degree of care … in supplying the child with … education" as required by law, 18 N.Y.C.R.R. § 432.1(b)(1), and New York's Compulsory Education Law contains a provision which authorizes the "board of education of every school district … to require minors who are five years of age on or before December first to attend kindergarten instruction." (2d M&O at 25 (quoting N.Y. Educ. Law § 3205(2)(c)). Quoting Regulation A-210(I)(A)(1) of the Chancellor of the DOE, which requires "children who turn 5 on or before December 31st of the school year to attend kindergarten at the beginning of that school year," unless "their parents elect instead to enroll them in first grade the following academic year," the Court concluded that S.I. was required to be attending school. When Mr. Issac stated at the April 3, 2020, hearing that S.I. was not attending school, school officials had reasonable cause to believe that S.I. was being maltreated and were legally obligated to call the SCR.

Turning to the third step of the burden-shifting analysis, the Court found that plaintiffs had not identified evidence that would allow a rational factfinder to conclude that the desire to retaliate was the but-for cause of the DOE's decision to call the SCR. Plaintiffs argued that the DOE was aware prior to the April 3, 2020, hearing that S.I. was not attending school. However, the Court noted that some of the evidence adduced by plaintiffs related to periods prior to the start of the 2019–20 school year, before S.I.'s attendance was compulsory. (2d M&O at 26

17

(citing Robinson Dec., Ex. M (Doc. No. 80-1) at 185–88.)  And the evidence that post-dated the start of the 2019–20 school year, consisted largely of emails that indicated plaintiffs were actively searching for an appropriate placement at the time and requesting an impartial hearing. (*Id.* (quoting Robinson Dec., Ex. M, at 188–90, 192–202.)  The Court concluded that there were no reasons for the school officials who received these emails to suspect educational neglect. (*Id.*)  In contrast, there was clear evidence of educational neglect adduced at the April 3, 2020, hearing, which school officials could not ignore.

The Court acknowledged that a reasonable factfinder might infer some retaliatory animus from the statements Ms. Vasishtha made when she called SCR.  (*Id.* at 27.)  But the Court held that even if these statements could be construed as implying retaliatory animus, there was nothing to suggest that "the adverse action would not have occurred in the absence of the retaliatory motive."  (*Id.* (quoting *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013)).  The DOE was legally obligated to call the SCR immediately after Mr. Issac stated at the April 3, 2020, hearing that S.I. was not in school.

The Claims Pursuant to 42 U.S.C. §§ 1983 and 12203

In addition to granting defendant summary judgment on the Section 504 retaliation claim, the Court granted defendant's motion for summary judgment on the two remaining claims.  First, the Court addressed defendant's motion for summary judgment with respect to the claim pursuant to 42 U.S.C. §12203, which makes it unlawful for an employer to "discriminate against any individual because such individual has opposed any act or practice made unlawful by [chapter 126 of title 42 – the Americans with Disabilities Act] or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."  42 U.S.C. § 12203(a).  The Court noted that § 12203 claims "are

18

governed by the same standards as Section 504 retaliation claims," (2d M&O at 28), and reasoned that plaintiffs' § 12203 claim should be dismissed for the same reasons as the Section 504 retaliation claim.

Second, the Court noted that to establish DOE's liability under §1983, plaintiffs had to show that a "municipal policy or custom" caused them to be subjected to the deprivation of a constitutional right.  (2d M&O at 29 (quoting *Agosto v. New York City Dep't of Educ.*, 982 F.3d 86, 97 (2d Cir. 2020)).  Since plaintiffs had "neither alleged nor proven the existence of a municipal policy or custom that violated their constitutional rights," the Court ruled that they had not made out a § 1983 claim.  (*Id.*)

The Instant Motions for Reconsideration

Plaintiffs and defendant now cross-move for reconsideration of the Second M&O. Plaintiffs' motion consists of an eight-page affirmation signed by both Ms. Robinson and Mr. Issac under penalty of perjury ("Plaintiffs' Affirmation").  Plaintiffs' Affirmation implies that the Court overlooked "critical evidence" in denying plaintiffs' Section 504 retaliation claim and their claims pursuant to 42 U.S.C. §§ 1983 and 12203.  (Plaintiffs' Affirmation at 1, 7.)  Defendant's cross-motion, set forth in Point II of the "Memorandum of Law in Opposition to Plaintiffs' Motion for Reconsideration and in Support of Defendants' Cross-Motion For Reconsideration" ("Defendant's Memo"), seeks reconsideration of the order denying defendant summary judgment on the IDEA implementation claim.

Plaintiffs' Affirmation contains 47 numbered paragraphs of "Facts that were Demonstrated" but presumably overlooked by the Court.  The first four paragraphs allude to unspecified changes that were made to Article 10 of the Family Court Act in May 2019, which "require schools and ACS to work with parents to resolve educational issues related to a

student's excessive absences prior to filing a petition for educational neglect."  (Plaintiffs'

Affirmation at ¶ 1.)  Plaintiffs' note that "[a]ttendance investigations—called a 407

investigation—require school personnel to reach out to parents when their children are frequently

absent" and that the "new law goes further to ensure that ACS and schools address absences

without neglect charges whenever possible."  (*Id.* at ¶ 3.)  However, the affirmation does not

provide specifics, except to cite two Chancellor's Regulations—A-750 and A-210—which the

DOE "must follow."  (*Id.* at ¶ 4.)

　　The next 12 paragraphs allege that other parents of disabled children have experienced

retaliation by the DOE for engaging in protected activity.  These allegations are largely based on

reports allegedly contained in "The 74," a news site operated by a non-profit organization that

covers the nation's education system.  However, some of the paragraphs contain only general

allegations of retaliation.  For example, paragraph 5 alleges that "[s]ome families say that New

York City schools are making unfounded reports" of child abuse; paragraph 6 alleges that

"school employees are more likely than any other group of mandatory reporters to make an

unsubstantiated claim of abuse or neglect"; paragraph 9 alleges that "some parents are claiming

that, after they pushed back against their school's treatment of their disabled children, school

officials retaliated"; and paragraph 14 alleges that "many families" have been "disrespected and

unfairly treated" by the DOE.  Other paragraphs contain conclusory statements asserting, for

example, that there exists a "clear pattern" of retaliation, (*id.* at ¶ 7); that "[c]alling ACS on

families is a known practice," (*id.* at ¶ 10), that "black and Hispanic children in New York City

are disproportionately likely to be subject to an ACS investigation"; and that "[t]ension between

special education parents and their children's schools is common in New York City," (*id.* at ¶

16).

Four of the paragraphs contain hearsay statements attributed to named individuals. (*Id.* at ¶¶ 8, 9, 12, 14.)  Plaintiffs state that they "would like to call some of these people as witnesses," (*id.* at ¶ 13), and "to be able to question witnesses" who were also subjected to retaliation by the DOE, (*id.* at ¶ 15).  However, plaintiffs have not even identified the specific witnesses they are prepared to call, much less provided the Court with affidavits or deposition transcripts indicating what testimony they might offer.

The remaining 31 paragraphs of the 47 "Facts that were Demonstrated" largely recount facts and arguments contained in plaintiffs' opposition to the motion for summary judgment.  In particular, plaintiffs argue that the Court disregarded "critical evidence" that "clearly shows" that defendant knew S.I. was not in school prior to the April 3, 2020 hearing.  (*Id.* at ¶ 19.)  In support that argument, plaintiffs note, among other things, that the Impartial Hearing Request dated September 19, 2019, indicated that S.I. was not in school, (*id.* at ¶ 43); that DOE's attorney, Joseph Montano, had a copy of the Impartial Hearing Request prior to the April 3, 2020 hearing counsel, (*id.* at ¶¶ 22–23), and that, between the filing of the Impartial Hearing Request and the April 3 hearing, plaintiffs told other DOE employees that S.I. was not attending school, (*id.* at ¶ 38).  Plaintiffs assert that they spoke with these employees on the telephone and in person, and not just via the emails contained in Exhibit M to the Robinson Declaration.  (*Id.* at ¶ 38.)  However, plaintiffs have not adduced any evidence to support this assertion.

Defendant opposes plaintiffs' motion for reconsideration, principally arguing that plaintiffs have "failed to 'point to controlling decisions or data that the court overlooked.'" (Defendant's Memo at 3 (quoting *CSX v. Shrader*, 70 F.3d 255, 257 (2d Cir. 1995)).  Defendant specifically addresses plaintiffs' "claim that DOE had knowledge of S.I.'s absence prior to … April 3, 2020," (*id.* at 2), arguing that "even if taken as true, this claim neither cures the fact that

21

S.I. was absent in contravention of New York's compulsory education law, … nor absolves Defendant of its obligation to report suspected educational neglect," (*id.*).

Although plaintiffs have filed an affirmation replying to Defendant's Memo (the "Reply"), it does not specifically address defendant's arguments.  Rather, the Reply asserts that plaintiffs "have pointed to Facts that was overlooked" and notes that Defendant's Memo "admits that Plaintiffs have rehashed facts."  (Reply (Doc. No. 88) at 1.)  The Reply then rehashes the facts yet again before providing some extraneous details regarding plaintiffs' ongoing disputes with the DOE.[4]

Defendant cross-moves for reconsideration of that portion of the Second M&O which denied defendant summary judgment with respect to the IDEA implementation claim. Specifically, defendant challenges the Court's determination that defendant could have taken further action 1) to conduct the evaluations required by FOFD-2020; 2) to fund the evaluations required by FOFD-2021; and 3) to effectuate the health-aide reimbursement ordered in FOFD-2021.

With respect to the first point, defendant concedes that the evaluations required by FOFD-2020 were never conducted.  Indeed, defendant cites to those portions of FOFD-2021 in which the IHO implied that the DOE failed to even contact plaintiffs regarding the evaluations until January 2021.  (Defendant's Memo at 5.)  However, defendant argues that  these "deficiencies … were remedied by the IHO's award of full tuition at Gersh" for the 2021–22 school year, (*id.* at 4), and that it has "no further obligations" with respect to the 2020–21 school

---

[4] Plaintiffs have also filed a letter dated December 13, 2023 (Doc. No. 91), which requests that the Court consider two new exhibits:  a transcript of a November 2023 hearing before IHO Linda Agoston and the IHO's FOFD, dated December 8, 2023.  These materials are irrelevant to the motions for reconsideration currently before the Court and will not be considered.

year because plaintiffs "were awarded the full relief that they requested" even though the evaluations were never conducted." (*Id.* at 5.)

Defendant also concedes that the evaluations required by FOFD-2021 were not conducted, but claims that plaintiffs are responsible for this failure. Defendant notes that FOFD-2021 provided that the evaluations were to be conducted by providers of plaintiffs' choosing. (Id.) Defendant asserts that plaintiffs never identified the evaluators, and that "DOE will complete implementation of FOFD-2021 and will fund the evaluations as warranted once Plaintiffs identify providers …." (*Id.*)

Similarly, defendant blames plaintiffs for its failure to reimburse plaintiffs for the health aide's services. Defendant states that the "DOE has conveyed to Plaintiffs on numerous occasions the documentation required for reimbursement for the services," and implies that plaintiffs have yet to provide the requisite documentation. (*Id.* at 6.) Defendant concludes that "there are no actions that DOE is currently obligated to take, pursuant to FOFD-2021 until the required documents are provided." (*Id.*)

Plaintiffs have nominally opposed defendant's motion for reconsideration in the Reply. That submission, however, also serves as the reply to defendant's opposition to plaintiffs' motion and, accordingly, largely addresses the arguments relating plaintiffs' own motion. It does not address any of arguments set forth in defendant's cross-motion, but merely asks the Court to "dismiss" or "deny" that motion. (Reply at 1.) Notwithstanding this fact, defendant has filed a Reply Memorandum of Law in Support of its Cross-Motion (Doc. No. 90), which largely repeats the argument raised in the cross-motion itself.

## STANDARD OF REVIEW

Preliminarily, the Court notes that neither plaintiffs nor defendant has articulated a valid basis for reconsideration.  First, Plaintiffs' Affirmation does not cite to any statutes or rules, but simply states that plaintiffs are "asking the court[ ] for a reconsideration" of the Second M&O.  However, because plaintiffs are proceeding *pro se* and because courts are required to construe *pro se* submissions "liberally and interpret them to raise the strongest arguments that they suggest," *Brownell v. Krom*, 446 F.3d 305, 310 (2d Cir. 2006), the Court will construe Plaintiffs' Affirmation as seeking reconsideration pursuant to Rule 60(b) of the Federal Rules of Civil Procedure.

Defendant asserts that its "motion for reconsideration is governed by Federal Rule of Civil Procedure 59(e) and Local Rule 6.3."  (Defendant's Memo at 1 (citing *Hertzner v. Henderson*, 292 F.3d 302 (2d Cir. 2002)).  A Rule 59(e) motion, however, is a motion to alter or amend a judgment and the motion for reconsideration in *Hertzner* was filed after judgment had already been entered.  *See Hertzner*, 292 F.3d at 303.  The Second Circuit has held that "a postjudgment motion requesting alteration or amendment of the judgment but denominated as something other than a motion under Rule 59 'is generally treated as having been made under Rule 59(e) … if the motion was filed within the 10–day period allowed for a Rule 59(e) motion.'"  *U.S. ex rel. McAllan v. City of New York*, 248 F.3d 48, 52 (2d Cir. 2001) (quoting *Lichtenberg v. Besicorp Group, Inc.*, 204 F.3d 397, 401 (2d Cir. 2000)).  Accordingly, Hertzner's motion for reconsideration, which was filed within 10 days of entry of judgment, was thus construed as a Rule 59 motion.

In this case, unlike *Hertzner*, the Court has yet to enter judgment or an appealable order.  *See* Fed. R. Civ. P. 54 (defining "judgment" as including "any order from which an appeal lies").

Accordingly, the Court "cannot consider [defendant's] motion as a motion to alter or amend a judgment under Rule 59(e)." *U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.*, 182 F.R.D. 97, 100 (S.D.N.Y. 1998) (citing *RR Village Ass'n, Inc. v. Denver Sewer Corp.*, 826 F.2d 1197, 1200–01 (2d Cir.1987)).  This motion, like plaintiffs' motion, is best construed as a motion pursuant to Federal Rule of Civil Procedure 60(b), which permits relief from orders on six enumerated grounds.

As a practical matter, however, "[i]t is of no consequence whether the motion here is viewed as a 'motion for reconsideration or reargument' or a 'motion to alter or amend' because 'the legal standards governing these motions are essentially the same.'" *Fischman v. Mitsubishi Chem. Holdings Am., Inc.*, No. 18-CV-8188 (JMF), 2019 WL 3034866, at *2 (S.D.N.Y. July 11, 2019) (quoting U.S. Titan, 182 F.R.D. at 100).  (S.D.N.Y. 1998), aff'd, 241 F.3d 135 (2d Cir. 2001).  The standards governing motions under Local Rule 6.3, 59(e), and 60(b) are "strict, and reconsideration will generally be denied."  *Herschaft v. N.Y.C. Campaign Fin. Bd.*, 139 F. Supp. 2d 282, 283 (E.D.N.Y. 2001) (quoting *In re Health Mgmt. Sys. Inc. Secs. Litig.*, 113 F. Supp. 2d 613, 614 (S.D.N.Y. 2000)).  To succeed in obtaining reconsideration, a movant must "point to controlling decisions or data that the court overlooked – matters, in other words, that might reasonably be expected to alter the conclusion reached by the court."  *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995).

Rule 60 motions have two limitations which are particularly relevant here.  First, "a Rule 60 motion 'may not be used as a substitute for appeal' and … a claim based on legal error alone is 'inadequate.'"  *United Airlines, Inc. v. Brien*, 588 F.3d 158, 176 (2d Cir. 2009) (quoting *Matarese v. LeFevre*, 801 F.2d 98, 107 (2d Cir. 1986)).  Thus, such a motion is "properly

denied" when it seeks "only to relitigate issues already decided." *Moreno-Cuevas v. Huntington Learning Ctr.*, 501 F. App'x 64, 66 (2d Cir. 2012) (summary order).

Second, "'reconsideration' means just that: Courts will not entertain arguments that could have been but were not raised before the just-issued decision." *Banister v. Davis*, 140 S. Ct. 1698, 1708 (2020); *see Nat'l Union Fire Ins. Co. of Pittsburgh v. Stroh Cos., Inc.*, 265 F.3d 97, 115 (2d Cir.2001) (noting that under Local Rule 6.3, a plaintiff may not raise a new argument for the first time in a motion for reconsideration). "Rule 60 does 'not allow district courts to indulge a party's discontent over … a 'deliberate, strategic choice ….'" *United Airlines*, 588 F.3d at 176 (quoting *Andrulonis v. United States*, 26 F.3d 1224, 1235 (2d Cir.1994)). "A chance to relitigate an issue under a different strategy or with different evidence is … exactly the sort of 'second bite at the apple' that makes reconsideration inappropriate." *Nastri v. Dykes*, No. 23-CV-0056 (JBA), 2023 WL 5276396, at *4 (D. Conn. Aug. 16, 2023) (quoting *Analytical Survs., Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 52 (2d Cir. 2012)).

## DISCUSSION

Plaintiff's Motion

Plaintiffs' Affirmation falls afoul of these two limitations. The first 16 of the 47 paragraphs of "Facts that were Demonstrated" contain evidence that was not included in plaintiffs' opposition to defendant's motion for summary judgment. Plaintiffs did not previously mention the provisions of Article 10 of the Family Court Act or 407 investigations, and did not previously cite to "The 74" or mention any of the statistics or anecdotal evidence reported in that online publication.

Even if the evidence contained in these 16 paragraphs were a valid basis for reconsideration, this evidence would not alter the conclusion reached by the Court. First, Article

10 of the Family Court Act is "designed to establish procedures to help protect children from injury or mistreatment and to help safeguard their physical, mental, and emotional well-being" and "to provide a due process of law for determining when the state, *through its family court*, may intervene against the wishes of a parent on behalf of a child so that his needs are properly met."  N.Y. Fam. Ct. Act § 1011 (emphasis added).  Plaintiffs do not cite to, and the Court has not independently found, any provisions of Article 10 that qualify or alter school officials' obligation, as "Mandated Reporters," to immediately call the SCR "when they have reasonable cause to suspect that a child is an abused or maltreated child where the parent, guardian, custodian or other person legally responsible for such child comes before them in their professional or official capacity and states from personal knowledge facts, conditions or circumstances which, if correct, would render the child an abused or maltreated child."  N.Y. Soc. Serv. Law § 413(1)(a).

Second, to the extent that plaintiffs are arguing that the DOE is required to conduct a 407 investigation before contacting the SCR, that argument is contradicted by the express provisions of section V of Chancellor's Regulation A-210.  Section V, entitled "Procedures for Reporting Maltreatment based on Educational Neglect," states, in relevant part:

A. A report of educational neglect must be filed in accordance with the requirements and procedures set forth in Chancellor's Regulation A-750 whenever the absences of a student of compulsory attendance age cause the mandated reporter to reasonably suspect all of the following , whether or not a Form 407 investigation was conducted:
   1. The parent is aware or should have been aware of the absences;
   2. The parent is contributing to the child absences or is failing to take steps to effectively address the problem and return the child to school …; and
   3. The absences are impairing the child's education.
B. Regardless of whether the conditions set forth in the paragraph above have been met, a report to the SCR must be made whenever school officials have reasonable cause to suspect child abuse or other forms of maltreatment ….

In this case, the three criteria in subsection A appear to have been met.  But even assuming they were not, a report to the SCR would still be mandated under the provisions of subsection B.  As discussed in the Second M&O, the school officials who attended the April 3, 2020, had reasonable cause to suspect maltreatment.  *See* 2d M&O at 25.

Third, the evidence from "The 74" could not have been considered in deciding the motion for summary judgment.  "[T]he evidence proffered by the party opposing summary judgment must be of a type that would be admissible at trial."  *Brink v. Union Carbide Corp.*, 210 F.3d 354 (2d Cir. 2000).  A party can rely on inadmissible hearsay in opposing a motion for summary judgment only if the party makes a showing that admissible evidence will be available at trial.  *See Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 924 (2d Cir. 1985).

Plaintiffs have not established that any of the evidence contained in paragraphs 5–16 of the "Facts that were Demonstrated" is admissible.  Some paragraphs contain unattributed hearsay.  *See, e.g.*, Plaintiffs' Aff. at ¶ 5 ("[s]ome families say"), ¶ 9 ("some parents are claiming").  Other paragraphs contain general allegations of DOE misconduct, *see, e.g.*, *id.* at ¶ 6 ("school employees are more likely than any other group of mandatory reporters to make an unsubstantiated claim of abuse or neglect"), ¶ 14 ("many families" have been "disrespected and unfairly treated"), while other paragraphs contain generalizations and conclusory statements, *see, e.g.*, *id.* at ¶ 7 ("clear pattern" of retaliation), ¶ 10 ("[c]alling ACS on families is a known practice"), ¶ 11 (black and Hispanic children disproportionately likely to be subject to ACS investigation), ¶ 16 ("[t]ension between special education parents and their children's schools is common").

While four paragraphs contain hearsay statements attributed to named individuals, *id.* at ¶¶ 8, 9, 12, 14, plaintiffs have not made a showing that admissible evidence from these witnesses will be available.  Rather, plaintiffs state only that they "would like to call some of these people as witnesses," *id.* at ¶ 13, and "to be able to question witnesses" who were also subjected to retaliation by the DOE, (*id.* at ¶ 15).  Plaintiffs have not specifically identified these witnesses, much less provided the Court with affidavits or deposition transcripts indicating what testimony they might offer.

Paragraphs 17–47 of the "Facts that were Demonstrated" largely repeat facts and arguments contained in plaintiffs' opposition to the motion for summary judgment and cannot serve as a basis for reconsideration.  Moreover, many of these facts seek to establish that defendant knew that S.I. was not attending school prior to the April 3, 2020, hearing.  Even assuming that plaintiffs could establish this, however, these facts would only demonstrate that DOE employees were delinquent in failing to call the SCR sooner.  They do not establish that the DOE's explanation that it was legally obligated to call the SCR after a hearing in which Mr. Issac openly stated that S.I. was not in school was a pretext for retaliation.

<u>Defendant's Motion</u>

Defendant's Memo also advances arguments that are not cognizable on a motion for reconsideration.  First, defendant argues, for the first time, that the evaluations ordered by IHO Wolman in FOFD-2020 are no longer necessary because S.I. was subsequently awarded full tuition at Gersh.  This argument was not raised in the motion for summary judgment, where defendant argued only that the evaluations could not be performed because plaintiffs failed to consent to them.  Since it appears that this argument could have been raised previously but was

not, reconsideration on this basis is not possible. *See Banister*, 140 S. Ct. at 1708; *Nat'l Union Fire Ins. Co.*, 265 F.3d at 115.

Defendant's remaining arguments for reconsideration simply repeat arguments that were made and rejected in the motion for reconsideration. Here, as in the previous motion, Defendant seeks to excuse the failure to conduct the evaluations required by FOFD-2021 by arguing that plaintiffs never identified the evaluators. Similarly, defendant again blames plaintiffs for its failure to reimburse plaintiffs for the home healthcare aide's services by implying that plaintiffs have yet to provide the documentation. The Court has already considered these arguments and rejected them for the reasons set forth in the Second M&O. Since defendant seeks only to relitigate issues already decided, reconsideration is denied.

The Court recognizes that neither party is likely to be able to appeal from the Court's rulings until the remaining IDEA implementation claim is resolved. The Court submits that it is in everyone's best interests to work together to ensure that S.I. receives whatever evaluations are still necessary and appropriate and that plaintiffs receive the reimbursement for the home health aide's services. If the parties cannot resolve the remaining issues amicably, they should request a settlement conference before Magistrate Judge Levy rather than engage in further futile litigation before this Court.

**CONCLUSION**

For the reasons set forth below, plaintiffs' motion for reconsideration (Doc. No. 83) and defendant's cross-motion for reconsideration (Doc. No. 87) are both denied.  The Clerk of Court is respectfully directed to mail a copy of this Memorandum and Order to plaintiffs and to note that mailing on the docket sheet.

SO ORDERED.

Dated: Brooklyn, New York
           December 28, 2023

*Roslynn R. Mauskopf*
ROSLYNN R. MAUSKOPF
United States District Judge

31